The **PENNSYLVANIA RAILROAD COMPANY**

v.

**NATIONAL MARITIME UNION OF AMERICA; Seafarers International Union of North America; International Longshoremen's Association; Local 1291, International Longshoremen's Association; and International Maritime Workers' Union.**

**Civ. A. No. 29761.**

United States District Court
E. D. Pennsylvania.
June 15, 1962.

Robert M. Landis and Richard N. Clattenburg, Philadelphia, Pa., for plaintiff.

Richard H. Markowitz, (for motion), Abraham E. Freedman, Philadelphia, Pa., for defendants.

VAN DUSEN, District Judge.

This action was brought under § 303 of the Labor Management Relations Act (29 U.S.C.A. § 187) by the owner of ore unloading facilities located at, and in the immediate vicinity of, Pier 122 South, Philadelphia, Pa., against the five defendant unions, claiming damages directly resulting from defendants' violation of § 8(b) (4) of the Labor Management Relations Act (29 U.S.C.A. § 158(b) (4)). The Motion to Dismiss now before the court was filed only by defendant Seafarers International Union of North America and alleges both that this court has no jurisdiction over the action and that the Complaint fails to state a claim upon which relief can be granted.

Plaintiff owns certain facilities[1] located at and near Pier 122 South. These facilities have been operated by Pennsylvania Tidewater Dock Company (hereinafter called "Tidewater") since 1954, when an agreement was entered into between Tidewater and plaintiff. Tidewater unloads ore from vessels engaged in commerce, the ore being either transported directly from the vessels to railroad cars for trans-shipment by railroad or stockpiled at the pier for eventual trans-shipment by plaintiff to other points in the United States (par. 11 of Document No. 1). Plaintiff receives from Tidewater 20¢ per ton for the ore and other bulk commodities unloaded from vessels and loaded into railroad cars for shipment to destination. Also, it receives freight revenues under its published tariffs for all ore shipped from Pier 122 to other destinations.

The Complaint alleges that from October 1960 to March 1961 defendants violated § 8(b) (4) by inducing or encouraging Tidewater employees and

---

1. These facilities include a finger pier, unloading machines, conveyor belts, car loading house and tracks, and a ground storage area (see Document No. 1, par. 10).

On this Motion to Dismiss, the allegations in the Complaint must be assumed to be true.

others to engage in strikes or other concerted refusals to perform services for Tidewater with the object of forcing Tidewater and others to cease dealing in the products of, or to cease doing business with, certain named third parties and forcing or requiring the named third parties to cease doing business with Tidewater.[2] Plaintiff claims that these unlawful, secondary boycott activities caused it to be deprived of the payments which it would have received under its agreement with Tidewater and also deprived it of revenues it would have received for the shipment of ore from Pier 122 to other destinations.

29 U.S.C.A. § 187 provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title.

"(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States * * *, and shall recover the damages by him sustained and the cost of the suit."

It is defendant's position that plaintiff has no standing to sue because it is claiming damages because of illegal activities directed against Tidewater, not against it. It relies on United Mine Workers of America v. Osborne Mining Company, 279 F.2d 716, 727–730 (6th Cir. 1960), cert. den. 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960). In that case, a sales agency (Love & Amos) with a verbal contract with Osborne (a coal mining and processing company) claimed damages for alleged harm to it (loss of commissions) caused by the destruction of Osborne's business by defendant's illegal activities. The Circuit Court reversed a judgment entered in favor of the sales agency, holding that the damage to the agency was too remote for recovery under federal law.[3]

However, the facts in this case are different than those in Osborne. Here, the plaintiff is the actual owner of the ore unloading facilities against which the activities were directed; the purpose of the defendants' activities was to prevent the unloading of certain ships at Pier 22 South and the injury claimed by plaintiff is direct interference with its "business and property" with ensuing losses.

The same court which decided Osborne decided in a later case, Gilchrist v. United Mine Workers of America, 290 F.2d 36, 39 (6th Cir. 1961), cert. den. 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76 (1961), that an action could be maintained by a partnership directly injured in its business and property which supplied its property for operation by another (G & R) for a price, since the damage sustained was direct and not remote, indirect or incidental. The Osborne case was distinguished on its facts, the court stating at page 39 of 290 F.2d:

"In the present case, the relationship between the partnership and G & R was much different than that existing between Love and Amos and Osborne Mining Co. The partnership here was a principal and not an agent. It had an established coal business and sold its own coal. It owned the leases, coal, mining machinery, equipment and facilities. In fact, the partnership had an integrated coal business in which only the actual mining was delegated to an instrumentality (G & R) controlled by its members. Activities of UMW were directed at the partnership."

The Circuit Court upheld the lower court's judgment for plaintiffs and noted

2. It appears from counsel's briefs (Documents Nos. 7 and 8) that the third parties were owners of ships which would have been unloaded at Pier 122.

3. The court approved the grant of substantial damages (punitive damages as well as loss of profits) to Osborne in this decision.

that the trial judge was the same one who had presided over the Osborne trial.

■■ In the case at bar, the relationship between Tidewater and plaintiff may be established as being similar to the relationship between the plaintiffs in Gilchrist. Plaintiff is entitled to an opportunity to develop factually such relationship.[4] The relationship is closer than that found in the Osborne case, supra, and the facts of record demonstrate that, because of plaintiff's ownership of the unloading facilities, the damage is undoubtedly more direct in this case than that sustained by the sales agency in the Osborne case.[5] Plaintiff should be given the opportunity to develop more fully the facts surrounding the operations at the pier.

For the reasons stated above, defendant's Motion to Dismiss will be denied.[6]

4. See paragraphs 2, 3 and 10–13 of the Complaint (Document No. 1). Plaintiff's brief (Document No. 8) states at page 4:
   "The operations at Pier 122 are an integrated system involving removal of ore from the ships to the conveyor belts and from the belts into railroad cars for shipment."
   At page 5 the following · language is used:
   "The sole purpose served by these facilities was the removal of ore from ships berthed at the pier and its transfer to railroad cars for shipment in an integrated operation. The object of the union's picketing was to prevent the unloading of the ore vessels, and the picketing was successful."

5. In the Osborne case, the facts had all been developed at a trial. No motion to dismiss was involved.

6. The cases relied on by this defendant in its brief (Document No. 7) are significantly different from the legal and factual situation presented by this record. In Melrose Realty Co. v. Loew's Incorporated, 234 F.2d 518 (3rd Cir. 1956), the claim was made that illegal activity diminished, rather than terminated, the lessee's receipts of which the lessor received a percentage, whereas in this case the alleged illegal activity prevented the unloading of specific tonnages on which defendant was entitled to a fixed amount (20¢ per ton), as well as freight revenues. The Melrose case relied on Harrison v. Paramount Pictures, 115 F.Supp. 312 (E.D.Pa.1953), where Judge Kirkpatrick had pointed out at page 316 as follows:
   "The fact is that while she (the landlord) would have had a right to rental above the minimum, if earned, she had nothing more than a hope that it ever would be earned. The tenant could have operated the business, from whatever motive, so as to keep the percentage from ever exceeding the minimum, for example, by cutting admission charges, discontinuing advertising or showing nothing but foreign language or documentary films, and there would be no right which the plaintiff could have asserted against him in that respect."
   In this case, defendants have deprived the owner from getting any rental at all and this rental is ascertainable.