**MASON–RUST, a Joint Venture, Plaintiff,**

v.

**LABORERS LOCAL NO. 42, LABORERS INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, Defendant.**

No. 68 C 94(2).

United States District Court
E. D. Missouri, E. D.

Sept. 12, 1969.

McMahon & Berger, St. Louis, Mo., for plaintiff.

Clyde E. Craig, Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., for defendant.

## MEMORANDUM

MEREDITH, District Judge.

This case was tried to the Court without a jury. The plaintiff is a joint venture composed of The Rust Engineering Company, a Delaware corporation, and The Mason & Hanger-Silas Mason Co., Inc., a West Virginia corporation. Defendant, Local 42 of the Laborers' International Union of North America, AFL–CIO, is a voluntary unincorporated association and is a labor organization within the meaning of 29 U.S.C. § 152. This Court has jurisdiction under 29 U.S.C. §§ 185 and 187.

Mason-Rust received a contract from the Corps of Engineers, United States Army, to perform construction work at the Gateway Army Ammunition Plant. Its job was to make certain alterations in the building so that it could be converted from a steel forging plant into a plant for the manufacture of artillery shells. Mason-Rust employed members of several construction trade unions, including Local 42. It operated with these unions on the basis of national and local contracts.

Mason-Rust has brought this action against Local 42 under 29 U.S.C. §§ 185 and 187 for damages allegedly sustained because of a jurisdictional strike prohibited by 29 U.S.C. § 158 that arose during the course of the work at the Gateway Army Ammunition Plant. The details of the strike and alleged damages will be described later.

Defendant Local 42 has moved to dismiss this action on the grounds that plaintiff is not the real party in interest and has not suffered any damages, even if all it alleges in its complaint was true. This argument is based upon the fact that plaintiff's contract with the Army was a cost-plus-a-fixed fee and that plaintiff was reimbursed for any losses sustained by reason of the strike. Plaintiff has admitted that any damages recovered will be turned over to the Army. Section 187, 29 U.S.C., allows a party "injured in his business or property" to "recover the damages by him sustained and the

cost of the suit." Defendant argues that since the Army reimbursed plaintiff for any out-of-pocket expenses caused by the strike, the Army could be the only party that has suffered any damage within the meaning of the statute, therefore, the suit should be dismissed. It is true that the damages provisions of this section 187 are to be strictly construed in some situations. In the area of punitive damages, it is clear that recovery for an employer's business loss caused by a union's activities proscribed by section 187 should be limited to actual, compensatory damages. Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964). The *Morton* case is distinguishable from the present case. In *Morton* the Supreme Court found that recovery of punitive damages would be a violation of national labor policy. In this case punitive damages are not in issue; the plaintiff is, under the allegations in the complaint, seeking only actual damages. This situation does not prevent plaintiff from maintaining this action and indemnifying the other contracting party, if it recovers damages. J. W. Terteling & Sons v. Central Nebraska Public Power & Irrigation Dist., 8 F.R.D. 210 (D.Neb. 1948). In Peelers Co. v. Wendt, 260 F.Supp. 193 (W.D. Wash. 1966), a cost-plus contractor was allowed to bring an action under the Clayton Act. It is the opinion of the Court that Mason-Rust can maintain this action and that the action should not be dismissed for failure to join an indispensable party, that is, the United States. All of the transactions involved in this case were between Local 42 and Mason-Rust. Mason-Rust has been damaged by the mere fact that the contract took longer and was more expensive to complete than was anticipated. Therefore, it should be allowed to maintain this action, and the Court will make a determination on the merits.

 Under 29 U.S.C. § 187(a) it is unlawful for any labor organization to engage in conduct or activities prohibited by 29 U.S.C. § 158(b) (4). That section defines the prohibited conduct as a secondary boycott or jurisdictional strike. Section 29 U.S.C. § 187(b) gives a person who has been damaged by union conduct prohibited by the foregoing sections a cause of action within the limitations of 29 U.S.C. § 185. The defendant admits that there was a jurisdictional strike from February 27, 1968, to March 5, 1968. It does not admit that it was responsible for the strike and denies that plaintiff was damaged by the work stoppage. The basic facts of the strike will be set out briefly before these two issues are specifically discussed.

One of the projects involved in the work at the Gateway plant was the construction of a quench pit. The pit was "T" shaped, approximately fifty-five feet by fifty in size, and about twelve feet deep. Its walls and floor were of concrete. The quench pit was to be used to house a metal tank which, in turn, would contain oil to cool the 175 mm shells during the production process.

On February 16, 1968, Leithauser, Mason-Rust's general superintendent, gave instructions to the carpenters to begin stripping away the plywood forms which made up the mold into which concrete was poured to form the pit. The carpenters began this work on the next day, a Saturday. No protest was made of this assignment of work. On the following Monday, Bob Tarpin, the steward for Local 42, came to Baird, the labor relations man for Mason-Rust, and claimed the work of lowering the concrete forms from scaffolding to the bottom of the pit. Baird told Tarpin the work would continue as assigned and that Local 42 and the carpenters' union would be contacted in an effort to resolve the dispute.

Baird contacted a business agent of Local 42, Emma, and told him of the claim. Emma said that he would relay the information to Tony Pelker, the business manager of Local 42, and request a meeting with the carpenters to settle the dispute. Baird reported these events to Leithauser.

On the next day, February 20th, the carpenters stopped stripping the forms. At this point the work was about half finished. Leithauser took no action concerning the unions because it seemed to be the area practice that when a dispute over work arose, the unions involved would stop work until their business agents settled the question. He did, however, tell Baird to continue to get the business agents together. Baird then telephoned Local 42's business agent, Paul Pelker, brother of Tony Pelker, about the dispute. Paul Pelker said the work was that of the carpenters and asked that Tarpin be brought to the telephone. Baird waited while Tarpin talked to Pelker and when he had finished speaking, Baird took the phone and was told by Paul Pelker that he was not sure to whom the work belonged and that he wanted to see the work before the dispute was settled. Baird insisted that Pelker meet with the Chrysler Corporation representatives, who were to operate the plant upon its completion, and Local 42 representatives P. Pelker and Harvill, and Jenkins of the carpenters' union. Baird met the union representatives in front of the Chrysler Building as they left the meeting. At that time Baird asked the three men to visit the site of the disputed work and resolve who would perform the work. Jenkins claimed it as carpenters work; Harvill and Pelker said nothing; and all three walked away.

The following day Baird called Tony Pelker and told him that Mason-Rust wanted work resumed. Pelker said there was nothing he could do about this request. Baird then telephoned the carpenters' steward Jenkins and received the same reply.

On Monday, February 26th, Leithauser told carpenter steward Brooks that he had never instructed him to stop stripping the forms and that he was to report to his office at 4:00 o'clock that afternoon. Leithauser also instructed assistant laborer steward Sanders to report to him at the same time. At 4:00 o'clock Sanders reported to Leithauser and he was told that the carpenters would resume stripping the forms on the next morning as they had done before. Sanders asked that the laborers be allowed to stand on the scaffolding and lower the forms to the ground. Leithauser reiterated what his orders would be to the carpenters. When Brooks later entered the office, Leithauser followed through and issued his orders.

About 8:00 o'clock on the next morning, February 27th, Leithauser went to the quench pit where he discovered that the forms were not being stripped away as instructed. Leithauser asked his carpenter superintendent why his orders were not being followed and upon receiving an answer, he reiterated his instructions. The carpenter steward was also present at this time. Then the carpenters began the work of stripping forms. Union stewards Tarpin and Sanders then came to Leithauser, and Sanders, in Tarpin's presence, threatened to pull all the laborers off the job if the carpenters did not stop stripping the forms immediately. Leithauser told the stewards that he did not want the work held up any longer.

At that time the laborers began to pick up their tools and walk toward the change shed, which was maintained for them to clean up and change their clothes. The only exception to this was a crew engaged in pouring concrete, and Tarpin walked over to the foreman and thereafter those laborers remained on the job until the concrete pour was complete a few hours later. The other laborers left the job, including stewards Tarpin and Sanders, and including the following elected officers of Local 42: Carl Badgley, trustee; Larry Kraft, sergeant-at-arms; and John Walsh, trustee. This walkout occurred between 8:30 and 9:00 a. m.

About 2:00 p. m., on the 27th, Harvill and Paul Pelker came to the jobsite and met with Leithauser and Baird. Harvill said he did not know why the walk-off occurred, but he would attempt to secure a return to the job.

The testimony of Tony Pelker established that a general membership meeting

of Local 42 was held on February 28, 1968. There were approximately three hundred and fifty members present, and a majority of those present were those laborers who walked off the job at the Gateway Army Ammunition Plant. At that time, these strikers voted unanimously to stay off the job as long as the carpenters were performing the work in dispute. Tony Pelker, Local 42's business manager, permitted the vote to be taken, and this vote was recorded in the minutes of the meeting.

On March 4th, Joseph V. Moreschi, president of the Laborers' International Union, wired an order to Tony Pelker instructing him to return the laborers to work at the Gateway Army Ammunition Plant. On that same day Baird telephoned Tony Pelker and asked when Mason-Rust could expect the men to return to the jobsite so that he could coordinate the use of equipment and supporting trades. Pelker told him that the men had been sent home from the union hall and that they would be unable to return to the job that day, but they would be sent out on March 5th, at 7:00 a. m., and all shifts thereafter, if Mason-Rust would drop the NLRB charges. Baird told Pelker that he would call back in this regard.

Later that same day, Baird called Pelker and said that he had spoken to plaintiff's attorney, labor relations manager, Leithauser and Higgins, the project manager, and Mason-Rust was willing to drop the NLRB charges provided the job was manned. Pelker replied that he could not get " * * * any better deal than that," and that the job would be manned the next morning. This testimony was not denied or otherwise disputed by Tony Pelker. The laborers returned to work on the following day, March 5, 1968.

Defendant Local 42 has denied that it was responsible for the strike. Section 29 U.S.C. § 185(b) states "Any labor organization which represents employees * * * shall be bound by the acts of its agents." Subsection (e) of 29 U.S.C. § 185 states:

"For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

The foregoing sections have generally been interpreted to mean that the general common law rules of agency apply to suits brought under 29 U.S.C. §§ 185 and 187. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). In the *Atkinson* case, the Court said:

"We have already said in another context that § 301(b) [29 U.S.C. 185] at least evidences 'a congressional intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it.' "

From this, it is clear that the Supreme Court means that it will apply the common law of agency to unions as it would to any other entity.

It is the opinion of the Court that the defendant is legally responsible for the acts of its agents. There were several agents of defendant in the plant who played a significant part in the strike. Tarpin was the union steward at the Gateway plant. It is clear from the record that he had great control over the members of the local at the job. He was to check union cards, handle disputes that arose, and make sure that members of other unions did not do work that belonged to laborers. He left the job with the men and did not return until they returned. He persuaded members of a concrete crew to remain until they finished pouring. In addition to Tarpin, an assistant steward by the name of Sanders was at the scene of the jurisdictional dispute and walked out with the rest of the laborers. Immediately before the walkout, Sanders threatened to pull the laborers off the job, if they did not get the disputed work. Three other elected officers of the local were working on this

particular job and participated in the strike. They were Carl Badgley, a trustee, Larry Kraft, the sergeant-at-arms, and John Walsh, a trustee. It is the opinion of the Court that these men had at least the apparent authority to call a work stoppage. This can be seen by the effectiveness of the strike. There were approximately three hundred and fifty laborers working three shifts at the Gateway plant. Of the laborers on the shift during which the work dispute arose, most left the plant within a few minutes after Mason-Rust assigned the work to the carpenters. The laborers did not report to work for the next two shifts that day, and no laborers showed up for work on any of the days between February 27th (the day of the strike) and March 5th, when all the men returned to work.

It is the further opinion of the Court that Local 42 ratified the acts of its members at the meeting of February 28, 1968. This was the regular meeting of the local. There was a quorum present. (The union constitution requires twenty members to transact business.) Most of those present were employed at the Gateway plant by Mason-Rust. A motion was made from the floor not to return to work until the work dispute had been settled. The motion was passed unanimously by the Mason-Rust employees who were the majority of those in attendance. This vote ratified the work stoppage.

■■ The Court has found that the defendant was responsible for the prohibited work stoppage. It is clear that plaintiff has suffered some damage because of this strike. Plaintiff has asked for damages in the amount of $97,172.02 and defendant claims that any damage was limited to a few dollars. Damages are difficult to ascertain with exactness in this type of case and there are conflicting theories of the proof needed to establish damages. It would seem to place an impossible burden on the plaintiff to require him to prove damages with mathematical precision. As the Court said in Sheet Metal Workers, etc. v. Atlas Sheet Metal Co., 384 F.2d 101, 109 (5th Cir. 1967):

"While the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation."

Plaintiff's claims for damages are based primarily upon loss of use of equipment and salaried personnel because of the work stoppage and overtime pay required to catch up after the strike ended.

It is clear from the record that the laborers' strike had a great effect on the operations at the Gateway plant. Not only was the work usually done by the laborers not done, but also many of the other crafts at the job could not work. Many of the other crafts require laborers to act as helpers or swampers. If the laborers are not available, they cannot work. This is reflected in the number of hours worked before and during the strike. In the four weeks preceding the strike, the total number of hours worked ranged from a low of 38,299 to a high of 47,095. During the week of the strike only 23,092 hours were worked. Some of these hours represent show-up time paid to members of the other craft unions on the job. Under contracts with these unions, the plaintiff is bound to pay for two to four hours to a worker if he shows up for work and there is none, unless he was notified the night before not to come in to work. Plaintiff's evidence shows that the total cost of show-up time paid was $7,264.82, during the time of the strike. Plaintiff also claims that defendant should bear the cost of the fringe benefits that were incurred by reason of the show-up time. Since there were other employees of these crafts working and not merely receiving show-up pay, the plaintiff must allocate the fringe benefits between the show-up time and regular work time. Plaintiff's evidence shows that the amount of fringe benefits paid on show-up time were $923.01. Show-up time of $7,264.82, plus fringe benefits of $923.01, or a total of $8,187.83, will be included in the judgment.

Plaintiff's main claim for damages is for the overtime it was required to work in order to get back on schedule after the men returned to work. The Army, plaintiff, and the other contractors who worked on the plant, had set schedules they tried to meet in order to supply ammunition for Viet Nam. They were trying to complete the project as soon as possible. The evidence showed that it took three weeks for plaintiff to get back to its regular schedule and work routine after the strike. During this period plaintiff was required to call an excessive amount of overtime by members of all crafts on the project. In the three weeks immediately preceding the strike, the total amount of premium pay was $99,-644.81 ($27,583.21, $39,342.41, and $32,-719.19). During the week of the strike it was $14,601.30. During the three weeks after the strike the premium pay was $159,959.42 ($33,078.26, $59,614.21, and $67,266.42). The average weekly premium pay was $33,214.93 for the three weeks before the strike; it was $53,319.-80 for the three weeks after the strike. The difference between $159,959.42 and $99,644.81 is $60,314.61. The plaintiff is entitled to the additional premium pay in the sum of $60,314.61.

Plaintiff also claims damages for rental construction equipment that could not be used during the strike. This equipment was rented by the month. Plaintiff has made no showing that it was necessary to keep this equipment on the job longer than originally planned because of this strike. The plant was not finished for more than one year after this strike. During this time there were other work stoppages. It would be mere speculation to try to assess damages to plaintiff for the rental of this equipment under these circumstances. The same is true with re-gard to plaintiff's office equipment and telephone rentals. Plaintiff's claims for damages on these items will be denied.

Plaintiff claims that its salaried workers could not function properly during the strike and that it should receive compensation for this period of inactivity. It estimates that this non-manual force had its effectiveness reduced forty-five percent. Plaintiff admits there was some work that could be done by these persons. The job was still in the planning stage in many respects. The testimony of plaintiff's witnesses indicates that the forty-five percent figure was the result of speculation. Therefore, this prayer for damages on this issue will be denied.

Plaintiff has asked for attorney's fees in this action. Attorney's fees are recoverable under this particular section of the Labor Act. Aircraft & Engine Maintenance, etc. v. I. E. Schilling Co., 340 F.2d 286 (5th Cir. 1965), cert. denied 382 U.S. 972, 86 S.Ct. 528, 15 L.Ed.2d 464 (1966); Sheet Metals Workers, etc. v. Atlas Sheet Metal Co., supra, 384 F.2d at 110. Plaintiff proved attorney's fees and expenses in the amount of $1,237.79 ($910.00 in fees and $327.79 in travel expenses), and this amount will be allowed.

The Court adopts the foregoing memorandum as its findings of fact and conclusions of law. A total judgment will be entered for the plaintiff as follows:

| Show-up pay: | | |
|---|---|---|
| Actual pay | $7,264.82 | |
| Fringe benefits | 923.01 | |
| Total | | $8,187.83 |
| Additional Premium Pay | | 60,314.61 |
| Attorney's fees and expenses | | 1,237.79 |
| | | $69,740.23 |