MASON–RUST, a Joint Venture, Appellee,

v.

LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, LOCAL 42, Appellant.

No. 20070.

United States Court of Appeals, Eighth Circuit.

Dec. 31, 1970.

---

5. This finding makes it unnecessary to examine the effect of the division orders signed by the lessors.

Harry H. Craig, St. Louis, Mo., for appellant.

Thomas M. Hanna, St. Louis, Mo., for appellee.

Before GIBSON and LAY, Circuit Judges, and HUNTER, District Judge.

GIBSON, Circuit Judge.

In this court-tried case the defendant Laborers' International Union of North America, AFL–CIO, Local 42 (hereinafter referred to as Union or Local 42), was found liable for damages occasioned by its jurisdictional strike in violation of § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, as amended. The plaintiff Mason-Rust, a joint venture, was the general contractor under a cost plus a fixed fee basis with the Corps of Engineers, United States Army, for the construction of the Gateway Army Ammunition Plant in St. Louis, Missouri.

The contract between Mason-Rust and the Army called for completion by October 1, 1968. The contract had not been completed at the time of trial in March 1969, and the estimated cost of $7,800,000 had escalated to $22,500,000. This project ran into considerable difficulty due to many causes, this jurisdictional strike being but one of many adverse factors hindering completion and escalating costs of the project. The Union admitted that some of its members had engaged in a strike or refusal to perform services at the Gateway Plant but denied that Local 42 was responsible and denied that plaintiff had suffered any damages.

Part of the contract called for the construction of a quench pit, a "T" shaped recessed installation approximately 55 x 50 feet in area and 12 feet deep. The quench pit would be used to house a metal tank which when filled with oil would cool the 175 mm. shells during the production process. Concrete was poured into construction molds built of plywood to form the walls and floor of the pit. On February 16, 1968, the superintendent instructed the carpenters to start stripping away the plywood forms which formed the molds. The carpenters began work on the next day, which fell on a Saturday. No protest was made of this assignment of work. Then on the following Monday, Bob Tarpin, the steward for Local 42, claimed the work for the laborers of lowering the concrete forms from the scaffold to the bottom of the pit. This request was refused but Local 42 and the carpenters' union were contacted in an effort to resolve the dispute.

On the next day, February 20, because of the laborers' claim, the carpenters stopped stripping the forms with the work about half completed. Efforts to settle the dispute proved fruitless, both unions claiming the right to this type of work. The dispute dragged along until Monday, February 26, when the superintendent told the carpenters to resume stripping the forms the next morning. After the carpenters began stripping the forms, steward Tarpin and Bill Sanders, the assistant steward, came to the superintendent and Sanders threatened to pull all of the laborers off the job if the carpenters did not stop that work immediately. The superintendent told them the work should not be held up any longer. The laborers then picked up their tools and walked off the job with the exception of a crew pouring concrete which remained on the job until the concrete pour was completed a few hours later. This walkout occurred between 8:30 and 9 a.m., with all of the laborers leaving the job including stewards Tarpin and Sanders and four other officials or trustees of Local 42.

Mason-Rust's position at this time on the work assignment in question was that the work had progressed a day and one-half without question, that area practice required assignment of this work to the carpenters and finally that Mason-Rust would incur unnecessary expense if it acceded to Local 42's demand. This project was proceeding under a no-strike contract with the laborers and Mason-Rust filed an unfair labor practice charge against Local 42 with the National Labor Relations Board, claim-

ing the jurisdictional strike constituted a violation of 29 U.S.C. § 158(b) (4) (ii) (D).

A general membership meeting of Local 42 was held on February 28, at which approximately 350 members were present, the majority of whom were laborers who had walked off the job at Gateway. Twenty members constitute a quorum under the Union constitution. A vote was taken at this meeting of those laborers striking the Gateway project and the strikers voted unanimously to stay off the job so long as the carpenters were performing the work in question.

The Laborers International Union on March 4 instructed Anthony Pelker, the business manager and principal officer of Local 42, to have the laborers return to work. Later that day Pelker offered to send the laborers back to work on March 5 if Mason-Rust would drop the NLRB charges. Mason-Rust so agreed and the laborers returned to work on March 5. In a later proceeding, the National Joint Board, to whom Mason-Rust had referred the matter, awarded the disputed work to the carpenters.

The work stoppage delayed or halted every critical phase of the project then in the process of completion and occasioned additional overtime over and above the regular overtime that would ordinarily have been needed to keep the entire project on schedule. There was testimony to the effect and the District Judge so found that it took three weeks of excessive overtime to make up for the work loss occasioned by this jurisdictional strike.

Under 29 U.S.C. § 187(a), § 303(a) of the Labor Management Relations Act, it is unlawful for any labor organization to engage in any activity or conduct prohibited by 29 U.S.C § 158(b) (4), i. e. a secondary boycott or a jurisdictional strike. Under § 303(b), "[w]hoever shall be injured in his business or property" by a secondary boycott or a jurisdictional strike may sue the union therefor within the limitations of 29 U.S.C. §

185 and "shall recover the damages by him sustained and the cost of the suit."

■ The Union's first contention is that Mason-Rust's complaint should have been dismissed because the NLRB did not first determine in a § 10(k) hearing that the Union's conduct constituted an unfair labor practice under 29 U.S.C. § 158(b) (4) (ii) (D). The Supreme Court expressly rejected this contention in International Longshoremen's Union v. Juneau Spruce Corp., 342 U.S. 237, 244, 72 S.Ct. 235, 96 L.Ed. 275 (1952) (footnote omitted):

"'The fact that the Board must first attempt to resolve the dispute by means of a § 10(k) determination before it can move under § 10(b) and (c) for a cease and desist order is only a limitation on administrative power. * * * These provisions, limiting and curtailing the administrative power, find no counterpart in the provision for private redress contained in § 303(a) (4).'"

Although § 303 was amended in 1959 so that the unfair labor practices covered were incorporated into § 303 by reference to 29 U.S.C. § 158(b) (4) rather than by express enumeration, we think it clear that the doctrine of *Juneau Spruce* is valid today. *See* Plumbers & Fitters, Local 761 v. Matt J. Zaich Const. Co., 418 F.2d 1054, 1056, 1057 (9th Cir. 1969).

The Union next contends it did not call, authorize, participate in, or ratify the strike or work stoppage. The Union admits that there was a jurisdictional dispute at the Gateway project and that it did claim that certain work assigned to carpenters should have been performed by laborers. It also admits that as a result of the assignment of certain work to carpenters by Mason-Rust, laborers employed by Mason-Rust walked off the job on February 27, 1968, and did not return until March 5, 1968.

The District Court concluded that the Union, Local 42, was responsible for the prohibited work stoppage. Several agents of Local 42 in the plant played a

significant part in the strike and the stewards had the implied actual authority to call a work stoppage and in fact did call for a cessation of work to back up their demands. These facts have been carefully delineated in the Memorandum Opinion of Judge James H. Meredith, 306 F.Supp. 934 (E.D.Mo. 1969). Under Rule 52(a), "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The complaining party has the burden of clearly demonstrating error in the findings. "A finding is clearly erroneous only when the reviewing court on the entire evidence is left with the definite firm conviction that a mistake has been committed." St. Louis Typographical Union No. 8 v. Herald Company, 402 F.2d 553, 557 (8th Cir. 1968). *See also* United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

■ At the outset, it should be recalled that for purposes of the Labor Management Relations Act, including § 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to the ordinary doctrines of agency. United Mine Workers v. Gibbs, 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We think the record provides firm support for the trial court's finding that agents of the Union were responsible for the work stoppage. The fact that the laborers walked off the jobsite immediately after steward Sanders' threats and Mason-Rust's refusal to assign the disputed work in accordance with the Union's demands is most persuasive that the members were complying with a strike called by stewards Tarpin and Sanders.

■■ We think the Union is bound by the action of Tarpin and Sanders in calling the strike and that their conduct falls within the scope of a steward's implied actual authority. *See* N.L.R.B. v. International Longshoremen's Union, Local 10, 283 F.2d 558, 563–564 (9th Cir. 1960). We also think the District Court's alternative holding that the Union ratified the acts of its striking members at its regular meeting of February 28, 1968, is warranted. A motion not to return to work until the dispute had been settled was offered from the floor at the meeting and was passed unanimously by the Mason-Rust labor employees present.

Although Mason-Rust's costs on the project were undoubtedly increased because of the jurisdictional strike, these costs were later reimbursed by the Army and the Union views Mason-Rust as having suffered no actual damages because of the strike. Recovery under § 303 is of course limited to actual compensatory damages. In the Union's view, if Mason-Rust intends to or is obligated to pay over to the Army any damages it collects, it is not then the real party in interest and the Army as the real party in interest should be joined as an indispensable party.

■ We do not think the Army is the real party in interest so as to make it an indispensable party to this action. While Mason-Rust admits that it has been reimbursed by the Army for all expenditures due to the strike, it is important to note that Mason-Rust had not been reimbursed at the time the lawsuit was filed against the Union. Mason-Rust was obligated to pay and subsequently did pay the increased costs, and thereafter sought reimbursement from the Army under their usual accounting procedures.

Rule 17(a), Fed.R.Civ.P.,[1] is broader than the old rigid concept of "real party in interest." Kilbourn v. Western Surety Co., 187 F.2d 567, 571 (10th Cir.

---

1. Rule 17(a) provides in pertinent part: "(a) *Real Party in Interest.* Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without join-

1951). The purpose of the Rule "is to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter." Celanese Corp. v. John Clark Industries, Inc., 214 F.2d 551, 556 (5th Cir. 1954); *see also* Dubuque Stone Products Co. v. Fred L. Gray Co., 356 F.2d 718, 723 (8th Cir. 1966). Professor Moore's analysis of the real party in interest principle and Rule 17(a) is pertinent:

> "Cases construing the real party in interest provision can be more easily understood if it is borne in mind that the true meaning of real party in interest may be summarized as follows: *An action shall be prosecuted in the name of the party who, by the substantive law, has the right sought to be enforced.*" 3A J. Moore, Federal Practice ¶ 17.07 (2d ed.1969) (footnote omitted).

This analysis of the real party in interest test has found general acceptance in the courts.[2] Young v. Powell, 179 F.2d 147, 150 n. 10 (5th Cir.), cert. denied, 339 U.S. 948, 70 S.Ct. 804, 94 L.Ed. 1362 (1950). *See also* Dubuque Stone Products Co. v. Fred L. Gray Co., *supra*.

Under § 303, whoever is injured by an unlawful jurisdictional strike can sue for compensatory damages. We think that Mason-Rust was injured within the meaning of § 303 even though it had been reimbursed by the Army. The fact that Mason-Rust was operating on a cost plus a fixed fee contract is no reason to deny it the right to protect the integrity of its operations under its contract with the Army. *See* Peelers Company v. Wendt, 260 F.Supp. 193, 200 (W.D. Wash.1966). As a cost-plus contractor, Mason-Rust had a contractual responsibility to construct the project in a workmanlike manner and to complete its contract within its estimated (subject to authorized revisions) cost. The contract also provided that the government may require Mason-Rust to make an accounting of its costs at any time prior to final payment. This last provision also makes clear that the payments which the Union alleges fully reimbursed Mason-Rust are but an advancement for cost in the nature of a loan by the government, and final payment to Mason-Rust is subject to reduction for any amounts it has received which the government should

ing with him the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States."

2. The cases relied upon by the District Court, although not expressly articulating Professor Moore's thesis, clearly reflect the real party in interest analysis posited by him. In J. W. Terteling & Sons v. Central Nebraska Public Power & Irrig. Dist., 8 F.R.D. 210 (D.C.Neb.1948), a diversity of citizenship suit, a prime contractor brought an action under a construction contract for monies due from the defendant for work performed. The stipulated facts established that certain subcontractors were to receive all proceeds of the suit and that the subcontractors had agreed to indemnify the plaintiff prime contractor for the costs of the litigation. Under Nebraska law, which governed the case, a construction contract between an owner and a prime

contractor confers no rights upon a subcontractor against the owner. Consequently, since the only party who had the right to sue the defendant on the contract was the prime contractor, the prime contractor was found to be the real party in interest.

In Superwood Corp. v. Larson-Stang, Inc., 311 F.2d 735 (8th Cir. 1963), a diversity case in which North Dakota law controlled, a contractor was found to be the real party in interest in an action for breach of warranty of fitness against a manufacturer, notwithstanding the fact that the houses containing the defective product had already been sold by the contractor. Since the North Dakota Uniform Sales Act was construed to confer upon the purchaser of the warranted goods the right to sue for breach of warranty even though he has resold the property, the substantive law of the case gave the right sought to be enforced to the contractor, the real party in interest.

determine do not constitute allowable costs. Furthermore, it appears that Mason-Rust is contractually obligated to indemnify the Army for any excessive costs incurred by Mason-Rust as a result of the strike for which Mason-Rust has been reimbursed. Since Mason-Rust is the party to whom § 303 gives the right sought to be enforced, Mason-Rust is the real party in interest even though the Army would benefit from any recovery by Mason-Rust.

Any doubt that Mason-Rust was not the real party in interest because it was reimbursed by the Army is remover by the application of the collateral source rule. Generally speaking, a tortfeasor cannot escape liability for wrongdoing merely because of the fortuitous circumstances of reparation from a collateral source.[3] The substantive law governing this action, of course, is federal law as fashioned from the policy of our national labor laws. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957). The collateral source rule has been applied in cases where employees sought recompense for lost wages. NLRB v. Marshall Field & Company, 129 F.2d 169 (7th Cir. 1942), aff'd, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744 (1943); NLRB v. Brashear Freight Lines, Inc., 127 F.2d 198, 199 (8th Cir. 1942). Since violations of § 8(b) (4) of the National Labor Relations Act are equated with tortious conduct in considering the nature of the Act and the right to compensatory damages, see United Mine Workers v. Osborne Mining Co., 279 F.2d 716 (6th Cir.), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960) and Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Company, 384 F.2d 101 (5th Cir. 1967), we think the collateral source rule is equally applicable to the reimbursement payments made by the Army to Mason-Rust.

We also think it is important to note that it is questionable whether the Army, representing the government, could bring suit under § 303 because 29 U.S.C. § 152 excludes the United States from the definition of "employer" used throughout the Act. We need not reach this question, however, because Mason-Rust, and not the Army, is the real party in interest.

We come now to the question of damages. The District Court awarded Mason-Rust $69,595.23. Only compensatory damages are allowable under § 303, Teamsters Local 20 v. Morton, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L. Ed.2d 280 (1964). The District Court found Mason-Rust's damages consisted of three items: (1) $8042.83 for show-up time paid during the strike, including fringe benefits allocated to the show-up time; (2) $60,314.61 for the extra overtime Mason-Rust was required to work in order to get back on schedule after the laborers returned to work; and (3) $1237.79 for attorney's fees and expenses.

Patently, the jurisdictional strike delayed every critical project then in the process of construction. In order to make up lost ground occasioned by the strike it was necessary not only to pay losses occasioned by other crafts not working because of lack of laborers' support, but to pay additional and increased overtime to bring the project back on schedule. Obviously, damages of this type cannot be figured to a mathematical certainty. The damages did occur and probably were more substantial damages than awarded by the District Court.[4] The rule of Story Parchment Co.

---

3. As concisely stated in 25 C.J.S. Damages § 99(1) (1966):

"Under the collateral source rule or doctrine, which is a well-established rule in the law of damages, a wrongdoer is not entitled to have the damages to which he is liable reduced by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him, or, stated more succinctly, the wrongdoer may not be benefited by collateral payments made to the person he has wronged." (Footnotes omitted.)

4. The District Court rejected additional claims of $27,576.79 as too speculative.

v. Paterson Paper Co., 282 U.S. 555, 562, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) is applicable here:

> "It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.

> \* \* \* \* \* \*

> "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."

And as succinctly stated in Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Company, 384 F.2d 101, 109 (5th Cir. 1967):

> "While the employer must prove that he has sustained some injury to his business property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation."

Guided by these principles, we review the particular items of damages awarded by the District Court.

### SHOW-UP TIME

Show-up time of $8042.83 was allowed. Mason-Rust needed to bring in a certain number of crafts each day in the hope that, and under the assumption that, Local 42 would cease its unlawful strike, for if no craftsmen were present the day the laborers returned to work another work day would effectively be lost.

The Union attacks this part of the judgment by contending Mason-Rust was obligated to mitigate damages, which it could have done by notifying the other workmen not to report for work, and further that no workman could collect show-up pay unless he provided a practical means of notification to the employer. Mason-Rust had its hands full trying to cope with the unlawful jurisdictional strike and was justified in keeping a number of craftsmen available for work since they did not receive cooperation from the Union in returning to work. During this time Mason-Rust had no way of knowing when the laborers might be available for work. This situation was occasioned by the Union, and Mason-Rust handled the matter about as economically as it could under the circumstances. Because of interacting union contracts and practices, it was economically more feasible to keep members of some of the crafts returning to work during the uncertain duration of the jurisdictional strike than it would have been to virtually shut down the whole project. Some contracts required that where a project was on more than one shift, as here, it must remain on shift for "three consecutive days" and if it did not, then the employees must be paid for 8 hours overtime if one day or less was involved, or for 3 days of straight time if the shift lasted for more than one day but less than 3 days.

The Union also contends the allowance of $2350.46 for show-up time paid the carpenters is erroneous. Section 7.07 of Mason-Rust's contract with the Carpenters Union provides that show-up time will be paid only if the carpenter "is not prevented from working by failure of other craftsmen to appear \* \* \*." The Union contends that since the carpenters were unable to work because they needed the striking laborers as helpers, the Company was under no obligation to pay show-up time to the carpenters because they were prevented from working because certain craftsmen (the laborers) failed to appear.

The Company's reponse is that the word "craftsmen" in the pertinent contractual clause means carpenters and not laborers; consequently, the carpenters' contract excuses Mason-Rust from payment of show-up time in cases of the absence of other carpenters, and not, as in the instant case, when the laborers fail to appear.

We are not fully convinced by Mason-Rust's argument that "other craftsmen" should be construed to mean carpenters in the contractual phrase above for we think had this been the intention of the Carpenters Union and Mason-Rust, they would have used the term "carpenters." However, the contract is ambiguous on this point, and under the commonly accepted dictionary definition, laborers are not craftsmen, though they certainly could be and might properly be so considered. While we might have found differently on this issue, we are not permitted to make *de novo* findings, and as a reviewing court, we cannot say that the District Court's finding is clearly erroneous.

The Union also questions fringe benefits of $377 paid to the Teamsters during the period of the strike because these payments covered parts of two pay periods and would have been payable under the Teamsters' contract in any event. This argument is beside the point as Mason-Rust lost the use of the Teamsters' services during this period because of the jurisdictional strike. The entire amount paid to the Teamsters, including the fringe benefits, during this period was lost to the construction program and constitutes a proper item of damages.

We think show-up damages in the total of $8042.83 should stand.

### ADDITIONAL PREMIUM PAY

The record supports the District Court's finding that Mason-Rust incurred and paid extraordinary overtime for a period of three weeks in order to make up for the loss of time on critical construction projects occasioned by the jurisdictional strike. In translating this loss to dollars, the District Court fashioned a formula of the difference between the premium pay expended for the three-week pay period following the end of the strike, amounting to $159,959.42, and the premium pay expended in the immediate three-week period preceding the strike, amounting to $99,644.81, the result being $60,314.61.

The Union complains about a number of variables in the formula, pointing out the extraordinary acceleration of costs on the entire project and noting a change of completion dates on some of the work. In particular, the Union complains that the District Court erred in calculating the amount of premium pay which Mason-Rust would have paid had there been no strike. The Union asserts that had there been no strike, the average weekly premium pay of $33,214.93 would have been paid by Mason-Rust for the week of the strike as well as the three subsequent weeks.

We do not think the Union has shown the District Court's finding to be clearly erroneous in this respect. In fact we are left with a definite and firm conviction that the District Court has utilized a reasonable and fair method of computing the damages arising from the jurisdictional strike. The additional premium pay expended during the three-week pay period following the strike was necessary to bring the critical stages of the project back on schedule and appears to be a fair and reasonable certain approximation of the damages incurred on this phase of the loss. The entire project had a high priority for completion and Mason-Rust was attempting to discharge its responsibility for getting the project back on schedule by utilizing the means available to make up for the loss of construction time occasioned by the strike. The Union did nothing to aid or assist in avoiding the jurisdictional strike or in minimizing the consequent cost, and it should be responsible for the damages occasioned by slowing or stopping critical stages of the project. The District Court's finding on this phase of the

damages issue is not shown to be clearly erroneous and must stand.

## ATTORNEY'S FEES AND EXPENSES

The Union acknowledges that attorney's fees are allowable in connection with efforts by the Company to bring an end to the jurisdictional strike. Nonetheless, the Union contends that legal services of $901 were in connection with research for a possible § 301 suit and not the instant § 303 suit, and furthermore, assuming these legal expenses were adequately connected to the instant suit, this suit was not filed until several hours after the laborers returned to work on March 5 and it therefore had nothing to do with bringing an end to the strike. The Union also argues that $177.33 traveling expenses incurred by a Mason-Rust attorney for a trip to the jobsite which was not begun until four hours after Mason-Rust had been assured on March 4 that the laborers would be back on the job at 7 a.m. the next day is not allowable because it had nothing to do with securing a return to work of the laborers.

We think these contentions are without merit. It was apparent from Mason-Rust's negotiations with Anthony Pelker on March 4 that the threat of the instant lawsuit and the charges filed with the NLRB played a decisive role in terminating the unlawful work stoppage. It was only after Mason-Rust agreed to withdraw its charges with the NLRB that Pelker agreed to return the laborers to work. We conclude that attorney's fees and expenses of $1237.79 were properly allowed by the District Court. *See* Local Union 984, Intern. Bro. of Teamsters v. Humko Co., 287 F.2d 231, 243 (6th Cir.), cert. denied, 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961); Construction & General Laborers, Local 438 v. Hardy Engineering & Construction Co., 354 F.2d 24, 27 (5th Cir. 1965).

While undoubtedly the overall efficiency of the project was damaged by a greater amount than was allowed by the District Court, the District Court properly disallowed additional claims for damages relating to rental equipment unused because of the strike, and losses incurred because of the inactivity of salaried employees due to the strike. These claims along with other damage claims presented were held to be too speculative to warrant an assessment of damages.

The judgment of the District Court is affirmed in the amount of $8042.83 show-up pay, $60,314.61 for additional premium pay, and $1237.79 for attorney's fees and expenses, or a total of $69,595.23.

LAY, Circuit Judge (concurring).

I agree with the majority that the judgment against the union should be affirmed. I concur, however, for different reasons. I do not agree with the majority that the contractor can assert the collateral source doctrine against the union's argument that the plaintiff suffered no damage. Collateral source relates to gratuities by volunteers or to reimbursement by reason of a collateral investment previously made by the injured party. The doctrine is not applicable where the plaintiff is reimbursed and by reason of the reimbursement loses his complete interest in the claim, by transfer or otherwise, to his indemnitor. When this occurs the indemnitor is subrogated to the entire claim and becomes the only real party in interest. United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 380–381, 70 S.Ct. 207, 94 L.Ed. 171 (1949); Link Aviation, Inc. v. Downs, 117 U.S.App.D.C. 40, 325 F.2d 613 (1963); Annot. 13 A.L.R.3d 229, 239 (1967). To allow the plaintiff to assert the collateral source doctrine under such circumstances could subject a defendant in various situations to multiple claims arising out of the same damage.

The defendant union asserts that the plaintiff contractor has not been "injured in his business or property," 29 U.S.C.A. § 187(b), because of its reimbursement of costs by the government through the cost plus fixed fee contract.

This raises the question of whether the contractor is the real party in interest under Fed.R.Civ.P. 17(a). As Judge Gibson points out, however, at the time this action was commenced the Army had not yet reimbursed the contractor for its increased costs arising from the union's misconduct of engaging in an improper jurisdictional dispute. When the lawsuit was commenced the contractor was the injured party and a proper party plaintiff. However, upon total reimbursement by the Army prior to trial under its cost plus contract, the contractor was no longer damaged[1] and was divested of its status as the real party in interest. At this juncture the defendant could have moved for substitution of the parties or joinder of the United States[2] under Fed.R.Civ.P. 25(c).[3] Hyatt Chalet Motels, Inc. v.

Salem Bldg. & Constr. Trades Council, 298 F.Supp. 699, 703–704 (D.Or.1968); Killebrew v. Moore, 41 F.R.D. 269 (N.D. Miss.1966); Wallis v. United States, 102 F.Supp. 211 (E.D.N.C.1952); United States v. Saunders Petroleum Co., 7 F. R.D. 608 (W.D.Mo.1947). The defendant did not move for joinder and must therefore be held to have waived any objection to the contractor's prosecution of the claim. Cf. Unison Realty Corp. v. RKO Theatres, Inc., 35 F.R.D. 232 (S. D.N.Y.1964); 3B Moore's Federal Practice (2d ed.) § 25.08 at 25–324 & 325 (1969). Upon final judgment in favor of the contractor any monies recovered will be held for the use and benefit of the government, which is the only party damaged. Link Aviation, Inc. v. Downs, supra.[4]

1. Cf. Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

2. Congress has provided that "[w]hoever shall be injured in his business or property" by an unfair labor practice may recover his damages. 29 U.S.C.A. § 187(b). (Emphasis ours.) This is broad and inclusive language which has a plain and unambiguous meaning. United Brick & Clay Workers v. Deena Artware, Inc., 198 F.2d 637, 644 (6 Cir. 1952). Cf. Wells v. International Union of Operating Engineers, 303 F.2d 73, 75 (6 Cir. 1962); Schatte v. International Alliance, etc., 84 F.Supp. 669, 673 (S.D.Cal.1949), aff'd 182 F.2d 158 (9 Cir. 1950), cert. denied 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608 (1950). An injured party, such as a project owner, may recover damages under this section even if it is not the employer against which the unfair practices are directed. Pennsylvania Railroad Co. v. National Maritime Union, 206 F.Supp. 797 (E.D.Pa.1962). Therefore, the exclusion of the United States from the definition of "employer" would not, in my judgment, preclude recovery by it under statute.

3. Rule 25(c) reads:
"In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be

substituted in the action or joined with the original party. Service of the motion shall be made as provided in subdivision (a) of this rule."

4. The contract between the Army and Mason-Rust provides in pertinent part:
"(f) The Contractor agrees that any refunds, rebates, credits, or other amounts (including any interest thereon) accruing to or received by the Contractor or any assignee under this contract shall be paid by the Contractor to the Government, to the extent that they are properly allocable to costs for which the Contractor has been reimbursed by the Government under this contract. Reasonable expenses incurred by the Contractor for the purpose of securing such refunds, rebates, credits, or other amounts shall be allowable costs hereunder when approved by the Contracting Officer. Prior to final payment under this contract, the Contractor and each assignee under this contract whose assignment is in effect at the time of final payment under this contract shall execute and deliver—
"(i) an assignment to the Government, in form and substance satisfactory to the Contracting Officer, of refunds, rebates, credits, or other amounts (including any interest thereon) properly allocable to costs for which the Contractor has been reimbursed by the Government under this contract * * *."