**CELANESE CORP. OF AMERICA**

v.

**JOHN CLARK INDUSTRIES, Inc. et al.**

No. 14729.

United States Court of Appeals,
Fifth Circuit.

June 30, 1954.

**552**

John W. Stayton, Charles L. Black, Austin, Tex., William H. Keys, Corpus Christi, Tex., for appellant.

Josh H. Groce and John H. Dittmar, San Antonio, for appellees.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and WRIGHT, District Judge.

HUTCHESON, Chief Judge.

The suit was for damages, actual and exemplary, for fire losses in plaintiff's hydraulic die casting plant[1] resulting from the use in it of Lindol HF–X, the hydraulic fluid sold and furnished to plaintiff by defendant for such use.

The claim as set out in detail in the complaint was: that in answer to plaintiff's inquiries as to the possible use in its business of defendant's hydraulic fluid known as Lindol HF,[2] defendant,

1. In 1949 Clark was engaged in the hydraulic die casting business in San Marcos, Texas. The hazard of fire is inherent in this business. The die casting machine operates under a pressure of approximately one thousand pounds per square inch, and a hydraulic fluid is used to transmit this pressure. Molten metal is poured into the die casting machine, and the machine casts or stamps that metal into products. To keep that metal molten in order to pour it into the machine, there must be a furnace almost immediately adjacent to the die casting machine which is operated at extremely high temperatures.

Clark had been using as a hydraulic fluid Aroclor, a product of Monsanto Chemical Company. This was apparently satisfactory from the standpoint of not catching on fire, but whenever a line break occurred the odors were so terrific that they caused the employees to become ill, and the plant had to be shut down for an appreciable length of time in order to

get the odors out of the building. Furthermore, the substance was toxic, and if any of it got on an employee's hands he immediately had to take steps to protect his skin. In addition, it ate into the gaskets in the machine, so that the gaskets frequently had to be replaced. The product, therefore, from these standpoints was unsatisfactory.

2. On July 12, 1949, Clark wrote to Celanese at its home office in New York to inquire of its product Lindol HF, an oily substance manufactured from coal tar and chemically known as tricresyl phosphate. Mr. W. W. Bell, director of sales of the organic phosphates department, chemical division, of Celanese, personally wrote back to Clark, giving the specifications of Lindol HF and describing it as being "nonflammable" and stating that it would not "support combustion". Accompanying this letter were testimonials from die casters and several pages of literature on Lindol HF. In the same

giving its specifications and stating that it was "nonflammable" and would "not support combustion", recommended most highly it and a new product HF–M and a still newer one, HF–X;[3] that actually plaintiff was the first customer to whom HF–X was sold and shortly thereafter in the plants of two other customers, severe and alarming fires occurred because of its use; that defendant directed the immediate removal from the lines in those plants of HF–M and HF–X; that plaintiff, however, was not advised of such fires or that the fluid had proven dangerous and particularly it was not directed because of its flammableness to remove the fluid from its lines; that instead it was merely advised in a wire that defendant was necessarily withdrawing the HF–X fluid from the market and that plaintiff should please arrange to replace HF–X with HF', which defendant would send it, and ship back the HF–X; that, not having been advised and not knowing that the fluid was a dangerous fire hazard, and being then engaged in getting out a rush order, plaintiff continued to use the fluid for a while after the HF substitute arrived on December 3, and on December 19, a line break occurred in the plant, the fluid sprayed out and flamed up fiercely, causing the damages sued for; that defendant was liable to plaintiff for breach of express and implied warranty, for negligence for failing to make adequate tests before selling the fluid, and for both simple and gross negligence in failing after actual

discovery of its dangerous qualities to warn plaintiff thereof.

The defenses were: (1) a general denial; (2) that the product was sold plaintiff under a contract whereby plaintiff expressly assumed the risks incident to the use; (3) that it was of defendant's standard quality and was sold under an agreement which expressly provided that seller makes no warranty of any kind, express or implied, except that the material shall be of seller's standard quality, and that plaintiff, though obligated to test the goods before use and notify defendant if the materials were found unfit, did not do so; (4) that certain named insurance companies with whom plaintiff had executed loan agreements were indispensable parties and should be named as plaintiffs in the suit; (5) that plaintiff was guilty of contributory negligence in not withdrawing the product from use on receipt of HF, the substituted material; and (6) that limitation had barred a large part of the recovery.

The issues thus joined, the cause proceeded to trial to a jury. In its course, a great deal of testimony was offered and, though there were some conflicts, the testimony on the issues of the negligence and gross negligence of defendant preponderated to prove the facts substantially as claimed by plaintiff, and at its conclusion the cause was submitted to the jury on special issues, all of which were found in favor of plaintiff with the exception that in answer to

communication Mr. Bell stated that Celanese was putting a new product on the market called Lindol HF–M which would combine all the advantages of Lindol HF with a superior viscosity at a lower price.

3. Clark then wrote back asking for details on Lindol HF–M, and in response Celanese telegraphed Clark on Aug. 5, stating that Lindol HF–X tests had been completed and offering it at $2.30 per gallon. Shortly thereafter Clark forwarded its order by mail for 104 gallons of Lindol HF–X, which arrived in San Marcos and was placed in Clark's hydraulic lines about Sept. 1, 1949.

Lindol HF–X was the third fluid sold by Celanese as a product of tricresyl phosphate, an oily derivative of coal tar, and it was the second adulteration of tricresyl phosphate. The first adulteration was Lindol HF–M, which was nothing more than 50 percent tricresyl phosphate and 50 percent petroleum oil. Lindol HF–X was 50 percent tricresyl phosphate, 46 percent aromatic petroleum oil, and 4 percent Santodex, which was a viscosity improver. However, from the standpoint of fire hazard, Lindol HF–M and Lindol HF–X were the same.

question No. 38, the jury found that plaintiff was negligent in failing to substitute HF for HF–X as requested by defendant. It found, though, in answer to question 39 that this negligence was not a proximate cause of the fire and in answer to other questions that defendant's negligence and gross negligence were.

Upon the issue of exemplary or punitive damages, the parties stipulated that if such damages should be allowed, they would be fixed at $17,500, the amount of plaintiff's attorneys' fees, and the jury allowed and fixed them at that amount.

Appealing from the judgment on the verdict, defendant is here with nine numbered specifications of error presented and argued under six numbered points, insisting that its motion for an instructed verdict should have been granted and the judgment should be here reversed and rendered, or, in the alternative, that the judgment should be reversed and the cause remanded for a new trial.

For the reasons hereafter briefly stated as to each of these grounds, we do not think so. Appellant's main, its most confidently argued point is the one asserting that plaintiffs are bound by the terms and provisions of the "acknowledgment of order", particularly those against warranty, which defendant insists constituted the contract between plaintiff and it.[4]

Appellees, in reply to this contention, citing many cases,[5] urge upon us: (1) that the contract was made and the obligations of the parties fixed before the acknowledgment of order was delivered to plaintiff; (2) that the provision in it on which defendant relies was not seen by, or called to the attention of plaintiff, and, therefore, was not agreed to by, or binding upon, it; (3) that contracts which it is claimed exempt from negligence are strictly construed and will not exempt therefrom unless the exempting provision claiming it is plain and imperative to that effect, especially is that so when exemption from gross negligence is claimed; and (4) that the provision relied on here does not even purport to exempt from either simple or gross negligence. It especially does not exempt from subsequent negligence after discovered peril.

We are of the clear opinion that appellant's claim of exemption from the consequences of its negligence and gross negligence is without merit under the facts of this case. This is so because: (1) the "acknowledgment" relied on was not contractual, the contract having already been made[6] before the acknowledgment was sent to plaintiff's office; and (2) if it was a part of the contract and should be given effect as a covenant against warranting, it did not purport

4. The face of the "Acknowledgment of Order" hereinafter called the "Acknowledgment" has printed thereon:

"The terms and conditions set forth on the face and back hereof constitute the entire agreement between us with reference to this sale."

Printed on the back of the Acknowledgment is this language:

"Warranties and Claims: Seller makes no warranty of any kind, express or implied, except that the materials sold hereunder shall be of Seller's standard quality, and Buyer assumes all risk and liability whatsoever, resulting from the use of such materials, whether used singly or in combination with other substances. * * *".

5. California & Hawaiian Sugar Refining Corp. v. Harris County, Houston Ship Channel Navigation Dist., D.C., 27 F.2d 392; 17 C.J.S., Contracts, § 262, page 644; Davis v. Ferguson Seed Farms, Tex.Civ.App., 255 S.W. 655; Edgar v. Joseph Breck & Sons Corp., 172 Mass. 581, 52 N.E. 1083; Fairfax Gas & Supply Co. v. Hadary, 4 Cir., 151 F.2d 939; Halliburton Oil Well Cementing Co. v. Millican, 5 Cir., 171 F.2d 426; Ingraham v. Associated Oil Co., 166 Wash. 305, 6 P.2d 645; Moorhead v. Minneapolis Seed Co., 139 Minn. 11, 165 N.W. 484, L.R.A. 1918C, 391; Panhandle Refining Co. v. Bennett, Tex.Civ.App., 13 S.W.2d 923.

6. Halliburton Oil Well Cementing Co. v. Millican, 5 Cir., 171 F.2d 426.

to, it did not, contract against its negligence and gross negligence.[7]

■ Appellant stands no better on its second point that the verdict, finding plaintiff negligent but that this was not the proximate cause of the loss, required: a judgment for defendant on the ground that the negligence of plaintiff was as matter of law the proximate cause of the loss, and the verdict, that it was not, was without support in the evidence; or, in the alternative, the granting of a new trial because the findings were fatally inconsistent and would not support the judgment. This is so because the answers to questions 38 and 39 must be read in the light of the court's definition of "negligence" and "proximate cause".[8]

In the light of those definitions, the findings certainly did not require the entry of judgment for defendant. In their light it is quite plain that the jury meant by the answer to question 38 to say that a prudent person would have substituted HF for HF–X as requested by defendant, but it did not mean to say that he would have done this because he would have foreseen that the natural and probable consequences of its failure to do so would have resulted in the fire and injury in question.

In answering questions 38 and 39 as it did, the jury thus fitted its answers to the questions asked and not to some suppositious content of the word "negligence" which had been otherwise defined in the charge. If the evidence supports the verdict that plaintiff was negligent in the sense of the definition of "negligence" contained in the charge, and we express no opinion on that point, it certainly as clearly supports and fully justifies the finding that such negligence was not the proximate cause of the fire but defendant's negligence was.

■ While it thus clearly appears that defendant was not entitled to a judgment on the verdict, it appears with equal clarity that there was no fatal inconsistency in the verdict, indeed no inconsistency at all. Under settled law, the submission of the issues of negligence and proximate cause under two separate questions was usual and proper. Besides, no objection was made to the submission of the issues in the form chosen. In the light of the definitions used, the two separate findings were not, they could not be, inconsistent.

Appellant's vigorous argument and its reliance upon Phillips v. Texas & Pacific Ry. Co., Tex.Civ.App., 223 S.W.2d 258, 263, in which the court said:

"Implicit in attributing the quality of negligence to an act or omission is the notice of or a duty to know of its harmful tendency. 38 Am.Jur., p. 667, par. 24; Seale v. Gulf, C. & S. F. Ry. Co., 65 Tex. 274, 57 Am.Rep. 602; City of Dal-

7. Fairfax Gas & Supply Co. v. Hadary, 4 Cir., 151 F.2d 939; 38 Am.Jur., "Negligence", Sec. 8, pp. 649–50; The exhaustive annotation in 175 A.L.R. 8 to 157; 5 Tex.Jur. 1026, Sec. 16; Ablon v. Hawker, Tex.Civ.App., 200 S.W.2d 265; 10 Tex.Jur. 220, Sec. 130.

8. "Negligence:
    "Negligence, as that term is used in this charge means the doing of that which an ordinarily prudent person would not have done under the same or similar circumstances, or the failure to do that which an ordinarily prudent person would have done under the same or similar circumstances."

"Proximate Cause:
"Proximate Cause, as that term is used in this charge, means the moving and efficient cause, without which the injury in question would not have happened; an act or omission becomes in law the proximate cause of an injury whenever such injury is the natural and probable consequence of the act or omission in question, and one that ought to have been foreseen by a person in the exercise of ordinary care in the light of the attending circumstances. It need not be the sole cause, but it must be a concurring cause, which contributed to the production of the said result in question, and but for which said result would not have occurred. There may be more than one proximate cause of an event."

las v. Maxwell, Tex.Com.App., 248 S.W. 667, 27 A.L.R. 927 * *." will not, therefore, avail it here, for the definition of "negligence", under which question 38 was submitted, negatived what appellant, on the authority of the cited cases, claims is "implicit" in the quality of negligence.

■ It may be true that the definition the court gave was not a correct one, but the time to call attention to that was at the submission, and this was not done. The jury was controlled by the definitions given in the charge, and in their light the answers are not at all inconsistent.

■ What was said by the Supreme Court of Texas in the case of Ford v. Carpenter, 147 Tex. 447, 216 S.W.2d 558, is peculiarly apposite here:

"It is the duty of the trial court to reconcile apparent conflicts in the jury's finding if they can be reasonably done in the light of the pleadings and the evidence, the manner in which the issues were submitted, and in view of the other findings when considered as a whole."

Appellant's three remaining questions have to do; (1) with the claim that the insurance companies were indispensable parties to the suit, or at least were real parties at interest under rule 17, and appellant should have had the benefit of making the fact that they were parties known to the jury; (2) with the claim of the insufficiency of the evidence to support a finding of gross negligence; and (3) with the claim that a part of plaintiff's demand was barred by limitation.

■ Since it is clear from the record that the suit was properly prosecuted by plaintiff under loan receipts, it is also clear that the insurance companies were neither indispensable nor necessary parties, and that, while the action of the court in permitting them to intervene in the suit was neither necessary nor proper, the defendant took no prejudice therefrom. The Clark Company was, under the undisputed facts of record, the real party at interest in the sense of the rule governing suits filed under loan receipt procedure,[9] but if they were proper parties, the defendant has suffered no legal wrong from the way the cause was tried.

■ As appellant points out in its brief, the purpose of the practice long obtaining in the federal courts and now set forth in Rule 17 of the Federal Rules of Civil Procedure, 28 U.S.C.A., that every action shall be prosecuted in the name of the real party in interest, is to enable the defendant to avail himself of evidence and defenses that the defendant has against the real party in interest, and to assure him finality of the judgment, and that he will be protected against another suit brought by the real party at interest on the same matter.

■■ In the light of the real meaning of the rule, if the insurance companies were proper parties, the defendant has suffered no legal wrong from the way the cause was tried. It was not deprived of offsets or defenses it might have had against them. It was understood by all that the counsel for the insurance companies were in active conduct of the suit and the judgment entered would have barred them whether or not they were actually in the cause, so that defendant was at no time concerned with the question of lack of finality of the judgment or the possibility of its being again sued. Its real, its only concern was not to have the insurance companies brought into the suit to protect itself against being again sued

**9.** Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170; Dixey v. Federal Compress & Warehouse Co., 8 Cir., 132 F.2d 275; Western Fire Ins. Co. v. Word, 5 Cir., 131 F.2d 541; Augusta Broadcasting Co. v. U. S., 5 Cir., 170 F.2d 199; Hudson Underwriters Agency of Franklin Fire Ins. Co. v. Ablon, Tex.Civ.App., 203 S.W.2d 584; Houston Transit Co. v. Goldston, Tex.Civ.App., 217 S.W.2d 435.

or with respect to offsets or claims against them but for the possible prejudice which plaintiff might suffer in the minds of the jury because of the knowledge that plaintiff was insured. Such a purpose is neither a proper nor a legal purpose. The courts have uniformly condemned it.[10]

■ To appellant's point that the claim of the insurance companies in the sum of $78,800 was by subrogation not to the claim of the plaintiff but to the claim of R.F.C. for damages to its mortgage interest, and the suit of plaintiff did not toll the running of the statute of limitations because the causes of action of the plaintiff and of the insurance companies are different, appellee correctly replies: that this is not so; that the insurance companies adjusted their loss not with the R.F.C. but with plaintiff, making their checks payable to plaintiff and the R.F.C., as mortgagee, jointly; that with the proceeds of this insurance, plaintiff's debt to the R.F.C. was paid off, and when its debt was paid, such rights, if any, as R.F.C. had in the insurance reverted to plaintiff; and that long before the two year statute of limitation ran, this suit was brought; and under rule 15(c) of the Federal Rules of Civil Procedure, when the insurance companies intervened, the amendment related back to the date of the original filing.[11]

■■ There is no substance in appellant's final point that the evidence does not support a finding of gross negligence. Indeed, we think that the conduct of defendant in not specifically warning plaintiff of the dangers of the continued use of the HF–X it had induced plaintiff to use, after it discovered them, is so flagrant as almost, if not quite, to support an instruction for plaintiff that defendant was guilty of gross negligence as matter of law. Indeed, we are of the clear opinion that under the undisputed facts there was subsequent negligence after plaintiff's peril was known to it of such a nature, whether it is called gross or not, as, under the humanitarian doctrine which underlies the law of discovered peril, to entitle plaintiff to an instructed verdict on that score.[12]

The judgment was right. It is affirmed.

---

10. Hudson Underwriters Agency of Franklin Fire Ins. Co. v. Ablon, Tex.Civ. App., 203 S.W.2d 584; Kuntz v. Spence, Tex.Com.App., 67 S.W.2d 254; Texas Co. v. Betterton, 126 Tex. 359, 88 S.W.2d 1039; Myers v. Thomas, 143 Tex. 502, 186 S.W.2d 811; Theurer v. Holland Furnace Co., 10 Cir., 124 F.2d 494.

11. American Fidelity & Casualty Co. v. All American Bus Lines, 10 Cir., 190 F. 2d 234; Kansas Electric Power Co. v. Janis, 10 Cir., 194 F.2d 942.

12. 30 Tex.Jur. p. 680; Carsey v. Hawkins, 106 Tex. 247, 163 S.W. 586; Texas & Pacific Ry. Co. v. Breadow, 90 Tex. 26, at page 31, 36 S.W. 410.