ACRO AUTOMATION SYSTEMS, INC.

v.

ISCONT SHIPPING LIMITED, et al.

Civ. No. PN–85–3264.

United States District Court,
D. Maryland.

Jan. 25, 1989.

David W. Skeen, Stephen F. White, Wright, Constable & Skeen, Baltimore, Md., for plaintiff.

JoAnne Zawitoski, Thomas Hoxie, David B. Goldstein, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant Iscont Shipping Ltd.

Donald C. Greenman, Ober, Kahler, Grimes & Shriver, Baltimore, Md., for defendants Timur Carriers (Private) Ltd. and Trans Freight Lines, Inc.

John T. Ward, Quinn, Ward and Kershaw, Baltimore, Md., for defendants Navifonds N.R. 10, Seeschiffanlagegesellschaft, and Engler Beteil Igungs—GmbH & Co.

Michael L. Schwartz, Kaplan, Schwartz & Blumberg, Baltimore, Md., for defendant Baltimore Shipping Co., Inc.

Robert H. Bouse, Jr., E. Philip Franke, III, and Anderson, Coe & King, Baltimore, Md., for defendants Bekins Van Lines Co., The Primary Source for Transp., Inc. and Bekins Forwarding Co., Inc.

J. Paul Mullen, George G. Tankard, III, and Lord & Whip, P.A., Baltimore, Md., and James M. Kenny, Leonard, Kenny & Stearns, New York City, for defendant Maher Terminals, Inc.

## OPINION

NIEMEYER, District Judge.

Acro Automation Systems, Inc., a business located in Milwaukee, Wisconsin, purchased laser welding equipment from a manufacturer in Israel and engaged Bekins High Technologies International (Bekins HiTech) to make arrangements for shipment of the equipment from Israel to Acro's place of business in Milwaukee. The equipment was shipped by various methods of transportation involving several different companies and was delivered to Acro in Milwaukee in September, 1984. When it was delivered, the equipment had been damaged and had a salvage value of $147,890. Acro had paid $400,000 for the equipment and consequently sustained a loss of $252,110, for which it now seeks damages.

Acro presented its claim in the first instance to its insurance carrier, Insurance Company of North America (INA) which recognized the damage less a deductible of $500. However, instead of paying Acro the amount outright, it loaned the money lost to Acro under an arrangement called a "loan and trust receipt," a commonly used arrangement to avoid INA becoming subrogated to the claim.

In the complaint filed in this case, Acro sued, among others, Bekins HiTech and two sister companies, Bekins Forwarding, Inc., which was the trucking company, and Bekins Van Lines, the holder of the interstate motor carriers license issued by the ICC under which Bekins Forwarding carried the cargo. The Bekins companies have claimed limitations of liability that would reduce the damages recoverable to $1.25 per pound, or a total of $24,000.

At this stage of the proceedings, Acro has moved for summary judgment on the limitation of liability defense, urging that as a matter of law no limitation of liability applies and it is entitled to claim the full $252,000. The Bekins companies have filed a motion to add Acro's insurance carrier, INA, as a real party in interest. For the reasons that are given hereafter, the Court will grant Acro's motion for partial summary judgment determining that the limitation of liability is not available in this case, and the Court will deny Bekins' motion to add INA as a real party in interest.

## I.

### LIMITATION OF LIABILITY

Before Acro engaged Bekins to arrange for the shipping of the laser equipment from Israel, Robert Leis, a representative of Acro, spoke with a representative of his insurance carrier about proper ways to insure the cargo. During their conversation the insurance representative advised Mr. Leis that Acro would enjoy a lower price for the carriage of its goods if it instructed the shipping agent not to declare the cargo's full value. Under this type of ar-

rangement, the limitation of liability would have been $1.25 per pound. The insurance representative actually gave Mr. Leis the name of a Mr. Pollard at Bekins, with whom to discuss the issue. Although Leis called Mr. Pollard at Bekins HiTech to make arrangements for the shipment, there is no evidence in the record that Leis actually discussed the issue with Mr. Pollard or instructed him to agree to a limitation on Acro's behalf. Neither Mr. Leis nor Mr. Pollard recalls any such conversation.

For part of the transportation from Israel, Pollard arranged with Bekins Forwarding, Bekins HiTech's sister company, to truck the machines from the Port of Baltimore to Milwaukee. When Bekins Forwarding delivered the equipment to Acro in Milwaukee, it presented a blank form of bill of lading issued by another sister company, Bekins Van Lines. Bekins Van Lines issued the bill of lading because it was the company that held the ICC license. The blank form of bill of lading that was delivered provided for signatures in three different blocks. The first was a shippers agreement to limitation of liability and included a blank space for the shipper's signature. The second block included an agreement as to the condition of the goods at origin and provided blanks for the signatures of the shipper and the driver. The third block included an agreement as to the condition of the goods at destination and provided blanks for the signatures of the consignee and the driver. On the only bill of lading produced in this transaction, the limitation agreement in the first blank remained unsigned. The agreement as to the condition of goods at origin was signed by the truck driver only, and the agreement as to the condition of goods at destination was signed both by Mr. Leis of Acro and by the truck driver. The damaged condition at delivery was noted. There can be no dispute that Acro signed at the time when the bill of lading was first presented on September 17, 1984, in Milwaukee after delivery of the damaged goods.

The Bekins defendants, in urging a written agreement limiting liability, offer only the document signed by Acro on September 17, 1984. They argue that this constitutes a clear written agreement of limitation. Additionally, they argue that the receipt and acceptance of the document, coupled with the subsequent action of Acro in paying the bill constitutes an acceptance of it. In their papers the Bekins defendants also suggest that the conversation between Mr. Leis of Acro and his insurance company about limiting liability should permit an inference that Mr. Leis actually did discuss a limitation of liability with Mr. Pollard of Bekins. They can point to no evidence of such a conversation, however, and for this reason the Court will dismiss that argument and direct attention to the written instrument.

A motor carrier moving cargo in interstate commerce is liable for the actual loss or injury that it causes to the cargo unless the carrier properly limits its liability. *See* 49 U.S.C. § 11707(a) and (c) (recodifying the Carmack Amendment to the Interstate Commerce Act (formerly 49 U.S.C. § 20(11)) without substantive change. Liability must be limited under 49 U.S.C. § 10730, which provides, in relevant part:

> The Interstate Commerce Commission may require or authorize a carrier ... to establish rates for transportation of property under which the liability of the carrier for that property is limited to a value established by written declaration of the shipper, or by a written agreement, when that value would be reasonable under the circumstances surrounding the transportation.

Rates founded on limited liability are lower than their counterparts based on full value because the shipper, in choosing the rate based on limited liability, becomes a co-insurer of the shipment.

In order to limit its liability, therefore, the carrier must (1) maintain a tariff in compliance with the requirements of the ICC, (2) give the shipper a reasonable opportunity to choose between two or more levels of liability, (3) obtain the shipper's agreement as to his choice of liability, and (4) issue a bill of lading prior to moving the shipment that reflects the agreement.

■ Because agreements limiting liability shift a portion of the risk of loss from the carrier to the shipper, as an exception to the full liability imposed on the carrier by the Act, they will be carefully scrutinized to assure that the shipper was given a meaningful choice and exercised it as evidenced by a writing. The burden of establishing that an agreement limiting liability has been made rests with the carrier. *See Flying Tiger Line, Inc. v. Pinto Trucking Service, Inc.,* 517 F.Supp. 1108, 1112 (E.D.Pa.1981).

The rules of scrutinizing such agreements are well established and are fairly summarized in *Anton v. Greyhound Van Lines, Inc.,* 591 F.2d 103, 107–08 (1st Cir. 1978), where the court said:

The shipper necessarily may "agree in writing" only after he has had the opportunity to inspect the written terms of the agreement. "Although action in writing by the shipper is plainly required, his signature is not necessary but it does furnish good evidence that he did declare or agree in writing." "Congress no doubt used these words to indicate that a shipper should agree in the same sense that one agrees or assents to enter into a contractual obligation." Such assent is effective, however, only if given after "a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge ..."

\* \* \* \* \* \*

[S]hippers are charged with notice of terms, conditions, and regulations contained in the tariff schedule pertaining to a carrier's liability which in turn affect the rates charged the carriage of goods. However, a carrier in order properly to limit its liability must do more than merely show that it maintained appropriate tariff schedules with the ICC. A carrier's arbitrary limitation of its liability for full actual damages is not effective unless the shipper enters into an agreement limiting that liability "as the result of an equally certain specified action ... in respect to a voluntary valuation of his goods."...

*In other words a carrier cannot limit liability by implication. There must be an absolute, deliberate and well-informed choice by the shipper.*

(Citations and footnote omitted) (emphasis added).

Liability for full damages is thus imposed on common carriers by the Interstate Commerce Act when the carrier accepts goods for transit "unless a certain specified agreement limiting that liability has been made as the result of an *equally certain specified action by the shipper* in respect to a voluntary valuation of his goods." *Caten v. Salt City Movers & Storage Co.,* 149 F.2d 428, 432 (2d Cir.1945) (emphasis added), cited with approval in *Chandler v. Aero Mayflower Transit Co.,* 374 F.2d 129, 137 (4th Cir.1967).

The question presented therefore is whether the bill of lading in this case evidences an absolute and deliberate choice on Acro's part to ship its cargo at a released value of $1.25 per pound.

■ Defendants argue that Leis' signature on the bill of lading constitutes an absolute, deliberate choice by Acro to agree to limit defendants' liability. Leis' signature, however, does not appear on the contract of carriage; rather, it appears only inside the box relating to the condition of goods upon receipt. The signature line inside the box containing the contract of carriage remains blank. Moreover, the signature of Acro on the bill of lading was made *after* delivery of the cargo and only evidences receipt of the cargo, with the condition noted. It does not evidence an intent to release the goods at a value of $1.25 per pound.

Although a signature in the contract of carriage box is not always necessary, particularly when the bill of lading is delivered *before* shipment pursuant to a clear understanding, the absence of the signature in the box specified for limiting liability becomes fatal when the bill of lading is delivered *after* delivery of the goods and *after* their damage. It can hardly be inferred that the shipper was given a choice, exercised the choice, and chose to limit liability when given a blank bill of lading after

delivery. The signature of Leis appears only under the description of the goods at destination. Any ambiguity that the location of the signature creates will be resolved against the carrier.

Defendants argue that even if Leis' signature does not constitute a choice to limit defendants' liability, Leis effectively made such a choice by accepting the bill of lading. It is true that a shipper can choose to limit a carrier's liability without signing the bill of lading:

> Although action in writing by the shipper is plainly required, his signature is not necessary but it does furnish good evidence that he did declare or agree in writing. Receipt of the writing by the shipper and his action upon it are adequate proof that he has assented to its terms and has made it the written agreement of the shipper and carrier.

*Caten,* 149 F.2d at 432. Therefore, when a writing that is the basis of the agreement limiting liability is assented to by conduct, the conduct, if unambiguous, will serve the same function at a signature.

In this case an agreement limiting liability in the absence of a signature would require delivery of the written agreement *before* performance of the contract of carriage so that the shipper's action on it in proceeding with the shipment reveals his assent to the terms of the agreement. *See American Railway Express Co. v. Lindenburg,* 260 U.S. 584, 591, 43 S.Ct. 206, 209, 67 L.Ed. 414 (1923).

In the instant case Acro accepted the bill of lading *after* delivery and *after* the property had been damaged. At that point, there was no action that could be taken upon the bill of lading. By the time the bill of lading was received defendants' performance had been completed (and the damage done). Acro's acceptance of the bill of lading at that point only acknowledged receipt of delivery, not acceptance of the terms of the contract of carriage.

The Court is directed to *Boeing Co. v. U.S.A.C. Transport, Inc.,* 539 F.2d 1228 (9th Cir.1976), in which acceptance of a bill of lading after a cargo has been delivered and damaged was held to bind the shipper to the terms of the contract of carriage contained in the bill of lading. *Id.* at 1230–31. An examination of this case reveals that the decision there is consistent with the principles enunciated in the instant case.

In *Boeing,* the Boeing Company had an arrangement whereby engines produced by Pratt & Whitney were shipped to Boeing by the U.S.A.C. Transport Company. When two of its engines were damaged during transit Boeing brought suit against USAC. The shipment in question was one in a series of similar shipments. In arranging for these shipments, Boeing entered into discussions with USAC, and at Boeing's request, USAC filed a tariff establishing rates for shipment of jet engines at a released value of $2.50 per pound. Each shipment traveled under a USAC bill of lading which contained an appropriate written statement of released value. Boeing had instructed Pratt & Whitney to ship the engines via USAC at the released value rate, and each prior shipment had moved under these conditions. In fact, on one occasion, when USAC sought to charge Boeing a higher rate based on actual value, Boeing returned the invoices to USAC, stating, "Although your freight bill shows 'value not released' on these engines, it is a well-known fact that all Boeing engines move on lowest release value." *Id.* at 1230. USAC corrected these invoices and Boeing paid them at the lower rate.

Under these circumstances, the Ninth Circuit affirmed the district court's decision that USAC had effectively limited its liability. The court rejected Boeing's argument that the bill of lading contained no agreement in writing limiting USAC's liability, finding that the circumstances of the case supported the conclusion that the parties had agreed to the written statement contained in the bill of lading.

None of the clear indicia of a limitation agreement that existed in *Boeing* exist in the instant case. There is no evidence here of a prior course of dealing demonstrating a choice to accept limited liability. The Court concludes here that the acceptance of the bill of lading after delivery of the

cargo and after the damage was done is not by itself enough to establish the absolute, deliberate decision to accept limited liability that is required.

In this case, under any theory advanced by the Bekins defendants, there is no evidence to show that Acro was offered a "fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge." *Chandler*, 374 F.2d at 135 (quoting *New York, N.H. & H.R.R. v. Nothnagle*, 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953)). This Court does not believe that the opportunity to choose between shipping rates after the shipment has been delivered and damaged constitutes a fair opportunity to choose. Had Leis sought to declare the full value of the laser by signing the contract of carriage on delivery of the damaged goods, it is doubtful that defendants would now agree that such an after-the-fact declaration would have altered a pre-existing agreement otherwise.

Relying on 49 U.S.C. § 10730, the Bekins defendants also urge that because they had a tariff on file limiting liability, the payment by Acro leads to an agreement of limited liability. In response, Acro argues that it paid a flat rate, not a tariff rate, that was negotiated and that its payment to defendants of $3,696 for shipping costs was not pursuant to any arrangement to limit liability.

The record shows that Bekins Forwarding, the trucker in this case, computed its charges for this shipment on a flat rate basis and not under a tariff. Harvie Wilson explained how Bekins Forwarding arrived at his charge to Bekins Van Lines (which was the holder in this case of the ICC license): "We more or less made our own rates for high-tech equipment, considering we were a flatbed company." His testimony revealed that he determined those rates by calculating how much he would have to charge for a shipment to cover his costs and make a profit for the company. The process did not include consulting the applicable tariff. The bill of lading, which was marked up after processing, also shows a "flat" rate of $2,465 was

charged. Bekins HiTech in turn billed that rate with a mark up to Acro, charging $3,696.

Originally, the bill of lading had the "HGB 412" tariff typed on it. Because Acro's shipment, having a net weight of 19,180 pounds, traveled 761 miles, the tariff amount would have been $10.05 per 100 pounds, or $1,928, far less than billed or paid. Pollard, the Bekins HiTech representative, testified that in arriving at the actual billing amount he assumed that a 10% increase had been put into effect (which is not supported by the record), and he charged for 21,000 pounds because Acro had exclusive use of the truck. This, however, computes to a charge of $2320, which still is different from the actual charges.

The record establishes that the charges in this case were not based on any established rate on file with the ICC but on a flat rate. In such circumstances, Bekins cannot urge the tariff in support of any attempt to limit liability.

In *Emily Shops, Inc. v. Inter–State Truck Line, Inc.*, 207 Misc. 557, 139 N.Y.S. 2d 561, *aff'd*, 2 N.Y.2d 405, 161 N.Y.S.2d 46, 141 N.E.2d 560 (1957), *cert. denied*, 355 U.S. 827, 78 S.Ct. 36, 2 L.Ed.2d 40 (1957), the court held that because the carrier charged a flat rate and disregarded the tariff and the regulatory law, it would not be allowed to take advantage of the limited liability provisions contained in that law. The court stated:

> The difficulty with the defendant's position is that its charge ... was not merely an excessive rate. It was no rate at all. The charge was "a flat sum of $115.00." A flat sum is not a rate. It is the opposite of a rate. The defendant, in doing what it did, acted as if there were no rates or tariffs and no regulatory law. Having completely ignored the law, the defendant should not be permitted to profit by the limited liability provisions contained in that law.
>
> \*    \*    \*    \*    \*    \*
>
> The flat sum deal made by this defendant was not a choice of rates either at common law or under the Interstate Commerce act. Where the statute and

the rates are completely disregarded and there is actually no choice of rates, the liability limitations of the statute do not apply.

The tariffs on file in the instant case were ignored as well. Defendants are not entitled to rely on the limitation of liability provisions implied in the rates.

Defendants argue that because the rate charged was very close to the rate allowed by the tariff, defendants substantially complied with the tariff provisions. *See Robinson v. Ralph G. Smith, Inc.*, 735 F.2d 186, 190 (6th Cir.1984) (adopting substantial compliance rule). The Court rejects this argument because the record shows that in determining a rate for this shipment defendants failed to comply in the least with the provisions of Tariff 412–A. Any similarity between the amount actually charged and the amount provided for by the tariff would be no more than a coincidence. These defendants did not afford to ACRO a choice of rates and did not even bill from one of the choices that would have been available.

■ In order to establish limited liability, a carrier must show not only that a tariff was on file but that a choice was given to the shipper, a deliberate and well-informed choice was made, and that the agreement was evidenced by a writing. The Bekins companies have failed on virtually every aspect of this burden and Acro's motion for summary judgment will be granted as to all Bekins defendants.

Of the three Bekins companies that are defendants only Bekins Van Lines has an ICC license. The others, Bekins Forwarding (the trucker) and Bekins HiTech (the broker) are not carriers as defined by the Act. Title 49 U.S.C. § 10730 states that the ICC may authorize a *carrier* to establish rates under which its liability is limited.

Mr. John Pollard, Bekins HiTech's former operations manager, testified that Bekins HiTech is not a carrier. It appears rather that Bekins HiTech is a broker as defined by 49 U.S.C. § 10102(1).

Likewise, Bekins Forwarding has not been granted authority by the Interstate Commerce Commission to engage in interstate transportation and has not advanced evidence that it is entitled to operate under Bekins Van Lines bills of lading and tariffs.

Because 49 U.S.C. § 10730 of the Act allows only carriers, as defined by the Act, to limit their liability, these defendants are not entitled to limit their liability in the manner specified by the Act. These defendants do not contest this. This serves as an alternative basis for the decision to grant Acro's motion for summary judgment against these two defendants.

## II.

### JOINDER OF INA

■ Defendants have moved to join INA, Acro's insurer, as a real party in interest pursuant to Rule 17(a), Fed.R.Civ. P. They argue that because INA paid the loss, less the $500 deductible, it is subrogated to that extent to Acro's claims. Indeed, when an insurer pays a loss, in whole or in part, it becomes subrogated to the extent of the amount paid and may be joined as the real party in interest. If it paid the entire sum, it is the *only* proper party, and if it paid part, both the insured and the insurer are proper parties. *See United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 380–81, 70 S.Ct. 207, 215, 94 L.Ed. 171 (1949); 6 Wright & Miller, Fed. Prac. & Proc. § 1566.

Acro opposes the motion, urging that joinder is not necessary in this case and that it should not have to put before the jury the collateral and perhaps influencing fact that it was insured for the loss. It argues that just to avoid the joinder problem, Acro and INA entered into a "Loan & Trust Receipt" which provides that INA will loan the claimed amount, less deductible, to Acro, and when and if Acro recovers from the responsible parties it will pay the money back. The agreement provides, in part:

> The undersigned [Acro] hereby acknowledge(s) receipt of $251,610 from Insurance Company of North America as a loan without interest (not a payment) re-

payable solely out of the net proceeds of any recovery of the property mentioned below, and out of any net recovery made against any carrier, bailee, insurer, or other third party liable for the loss mentioned below; and as trustee(s) of an express trust the undersigned agree(s) to hold in trust for said Insurance Company all such property and monies so recovered, and all rights of action for the recovery thereof.

The issue presented is whether to give recognition to this agreement or to disregard it as a sham device to avoid joinder.

Although this device is commonly used, the circuits that have addressed it are split over its legal effect. *Compare Ketona Chemical Corp. v. Globe Indemnity Co.*, 404 F.2d 181, 184 (5th Cir.1968) (insurer not real party in interest); *R.J. Enstrom Corp. v. Interceptor Corp.*, 520 F.2d 1217, 1219–20 (10th Cir.1975) (insurer not real party in interest) *and Frank Briscoe Co. v. Georgia Sprinkler Co.*, 713 F.2d 1500, 1502 n. 1 (11th Cir.1983) (insured retains sufficient interest when loan receipt is used so that insured, not insurer, is real party in interest) (dictum) *with City Stores Co. v. Lerner Shops of District of Columbia, Inc.*, 410 F.2d 1010, 1014–15 (D.C.Cir.1969) (insurer is real party in interest) *and Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 513 (6th Cir.1974) (insurer is real party in interest). Because the Fourth Circuit has not ruled on this question, and because those circuits that have addressed the question are split, the Court will turn to the policy behind Rule 17(a), Fed.R.Civ.P., for guidance in resolving the question here.

Rule 17(a) requires that every action be prosecuted in the name of the real party in interest. The purpose of this rule is to enable a defendant to avail himself of evidence and defenses he has against the real party in interest and to assure finality of judgment. *See, e.g., Virginia Electric & Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78, 83 (4th Cir.1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1450, 39 L.Ed.2d 493 (1974); *Celanese Corp. of America v. John Clark Indus., Inc.*, 214 F.2d 551, 556 (5th Cir.1954).

It would be totally unacceptable to have a plaintiff file suit and recover from a defendant only to have the plaintiff's insurance company, who was not bound by the earlier adjudication, file suit at a later time for the loss paid and to which it became subrogated. Were the "Loan & Trust Receipt" agreement in this case to permit this possibility, the policies of Rule 17(a) would require joinder.

The "Loan & Trust Receipt" agreement, however, will not lead to the possibility of double litigation or recovery. The terms of the agreement give INA full control over the litigation, stating in part:

[T]he undersigned [Acro] hereby irrevocably appoint(s) said Insurance Company [INA] as agent and attorney-in-fact of the undersigned with full power to collect, enforce, compromise, release and dispose of such property, claims and recoveries through attorneys and representatives of the said Insurance Company's own selection, by legal proceedings or otherwise, all in the name and with the full cooperation of the undersigned, but at the sole expense of the Insurance Company; and the undersigned undertakes to execute such documents as may be necessary to carry out the purpose hereof.

When a non-party assumes control of a party's litigation, the non-party is precluded from relitigating the claims litigated in the first action. *Montana v. United States*, 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). There can be little doubt that in the circumstance of this case where INA loaned Acro the money under an agreement by which Acro surrenders control of prosecuting the litigation, INA will not be free to pursue the same litigation in its own name if it loses the present case for Acro.

Moreover, there has been no suggestion that defendants have defenses against INA that they cannot assert against Acro, nor does INA's status as a non-party prevent defendants from conducting discovery against INA. All of the policy considerations behind Rule 17(a) are satisfied in the circumstances of this case without the join-

der of INA. *See Virginia Electric*, 485 F.2d at 84.

Absent an undermining of the policy considerations of Rule 17(a), the question remains whether the obvious intent of circumventing the consequences of subrogation should be permitted when the effect is to conceal from the jury the true interests of the parties in the litigation. No doubt every insurance company that is obligated to pay or has paid a loss has an interest in the claim against the party causing the loss. On the other hand, the collateral arrangement by a plaintiff in protecting itself with insurance should not affect its claim on the merits against a tortfeasor. Yet it is precisely that untoward effect that defendants such as those in this case seek to invoke by making INA a party plaintiff. They would consider it a strategic advantage to have the jury know that a plaintiff has another source of recovery other than from them. Unless there are strong countervailing policies, therefore, the Court believes that the intent of Acro and INA in arranging their affairs by contract to avoid the concededly irrelevant issue of insurance should be given effect.

The prejudice that would result from apprising jurors of plaintiffs' insurance coverage in negligence actions has been long recognized and decried in the federal courts:

> It has been long and frequently held that in the ordinary action for damages arising out of negligence, evidence relating to liability insurance or other insurance is inadmissible because it is wholly immaterial to the main issue of negligence with resulting liability for damages, and can serve no purpose except to bias or prejudice the jury.

*Theurer v. Holland Furnace Co.*, 124 F.2d 494, 499 (10th Cir.1941); *Celanese Corp. of America v. John Clark Industries*, 214 F.2d 551, 556–57 & n. 10 (5th Cir.1954).

In *Celanese* the court affirmed that the plaintiff's insurer, who had loaned the plaintiff its policy proceeds through a loan-trust receipt type of agreement, was not a real party in interest. Even if the insurer were a real party in interest, the court

reasoned, the defendant was not prejudiced by the trial court's decision to keep the insurer's involvement a secret from the jury, and to do so effected a fair result: "[Defendant's] only concern was ... for the possible prejudice which plaintiff might suffer in the minds of the jury because of the knowledge that plaintiff was insured. Such a purpose is neither a proper nor a legal purpose. The courts have uniformly condemned it." *Id.* at 556–57 (footnote omitted).

A similar view was expressed well by then Circuit Judge Warren Burger, in dissenting from the majority decision in *City Stores Co. v. Lerner Shops of District of Columbia, Inc.*, 410 F.2d 1010 (D.C.Cir. 1969):

> [Defendant] would prefer to be sued by a named insurance company so that a jury verdict might be moderated by the realization that the injured plaintiff has coverage for his losses. This motivation seems hardly more worthy than the insurer's motive in suing in the insured's name so that its recovery will not be improperly minimized when the jury takes cognizance of the fact that an insurance company is suing to recover the losses in question.

> \*     \*     \*     \*     \*     \*

> The insurers and policy holders have entered a "loan receipt agreement" for the purpose of avoiding subrogation. The parties call their agreement a loan, but they also *intend* that it be one if only for its operation in preventing subrogation. When parties enter agreements with the desire to affect their private legal relationships and rights, the agreements should not be nullified unless compelling policy reasons so command. I for one can discover no policy considerations which demand the naming of insurers as parties to litigation when not to do so is to allow the jury to consider the issues of liability and damages strictly on the merits and without regard to the coverage or non-coverage of the parties litigant.

*Id.* at 1016 (Burger, J., dissenting) (footnote omitted).

The Court concludes that the agreement, intended to circumvent the requirements of Rule 17(a), does not in this case frustrate the policies of the rule. Because to hold otherwise would provide a foreign and unwelcome influence on plaintiff's case, the Court will give effect to the "Loan & Trust Receipt" agreement.

Defendants have moved that INA be joined also by reason of Rule 19(a), Fed.R. Civ.P. Rule 19(a) states, in relevant part,

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties....

The Advisory Committee Notes state that the purpose of this rule is to ensure finality of judgment:

[Rule 19(a)(1)] stresses the desirability of joining those persons in whose absence the court would be obliged to grant partial or "hollow" rather than complete relief to the parties before the court. The interests that are being furthered here are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter.

As established above, INA's complete control over the present litigation will preclude it from relitigating any of the issues which will be litigated in this action. Because INA will not be able to raise these issues against defendants in the future, complete relief can be accorded among the parties as presently constituted, and joinder of INA is not necessary.

For the foregoing reasons, the Court will deny the motion of the Bekins defendants to require joinder of Acro's insurer. A separate Order will be entered.

## ORDER

For the reasons that are given in the Opinion filed herewith, it is ORDERED this 25th day of January, 1989, by the United States District Court for the District of Maryland, that:

1. The motion of Acro Automation Systems, Inc. for partial summary judgment against defendants Bekins Van Lines Co., Bekins Forwarding Company, Inc. (formerly GO–98, Co.) and The Primary Source for Transportation Services, Inc. (formerly Bekins High Technologies International, Inc.) is granted, and these defendants may not rely on claimed limitations of liability;

2. The motion of these defendants to require the joinder of Insurance Company of North America is denied.